IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Marcia S. Krieger

Civil Action No. 18-cv-01112-MSK-SKC

JAMES RALPH DAWSON,

    Plaintiff,

v.

COLEMAN, BVCC Associate Warden;
DAVID LISAC, Major; and,
TRESCH, CO,

    Defendants.

---

**OPINION AND ORDER DENYING MOTION FOR SUMMARY JUDGMENT**

---

**THIS MATTER** comes before the Court pursuant to the Defendants' Motion for Summary Judgment **(# 49)**, Mr. Dawson's response **(# 54)**, the Defendants' reply **(# 55)**, and Mr. Dawson's surreply **(# 56)**. Also pending is a motion for leave to restrict public access to several documents filed by the Defendants **(# 53)** and Mr. Dawson's Motion for Leave to File a Surreply **(# 57)**.[1]

## FACTS

The Court summarizes the pertinent allegations here (with disputed facts taken in the light most favorable to Mr. Dawson), elaborating in detail as appropriate in the analysis.

---

[1] Mr. Dawson's tendered surreply **(# 56)** does not meaningfully expand upon the arguments herein or materially alter the Court's analysis. Thus, his motion for leave to file it is denied as moot.

1

At all times pertinent to this matter, Mr. Dawson was an inmate in the custody of the Colorado Department of Corrections ("CDOC"), assigned to the Buena Vista Correctional Complex ("BVCC"). **(# 1 at 7)**.

### Events Giving Rise to Mr. Dawson's Claims

On or about January 30, 2018, Mr. Dawson was transferred from the Fremont County Correctional Facility to the BVCC. Upon his arrival to BVCC, Mr. Dawson received an orientation by BVCC Associate Warden Bryan Coleman and BVCC Custody and Control Manager David Lisac. **(# 54 at 11, # 49 at 3)**.

At this orientation, Mr. Dawson advised both Mr. Coleman and Mr. Lisac that while he was previously incarcerated at the Limon Correctional Facility, he was involved in an incident with another inmate, Arthur Moore, who is currently housed at BVCC. Mr. Dawson told Mr. Coleman and Mr. Lisac that he had been instructed to give Mr. Moore a knife to resolve a racial dispute. However, rather than using the knife in an attack on another inmate, Mr. Moore deliberately got caught by prison staff possessing the knife and blamed the entire incident on Mr. Dawson. **(# 1 at 7, # 54 at 11)**. Mr. Dawson advised Mr. Coleman and Mr. Lisac that if he was housed at the same facility with Mr. Moore, his life would be in jeopardy. **(# 1 at 7, # 54 at 11-12)**. In response, both Mr. Coleman and Mr. Lisac assured Mr. Dawson that "they would make sure that [he] was interviewed by a BVCC intel-officer and removed from the BVCC general population." **(# 1 at 7, # 54 at 12)**.

Mr. Dawson was then escorted to the BVCC East Unit, a general housing unit, where he noticed Mr. Moore was standing there "waiting on him." **(# 1 at 8, # 54 at 12)**. Mr. Dawson informed Corrections Officer Tresch, who was working at the East Unit Operations Office, that his life would be in jeopardy if he was housed with Mr. Moore. Mr. Dawson explained to

2

Officer Tresch his history with Mr. Moore, including the incident with the knife at the Limon Correctional Facility. Mr. Dawson then asked Officer Tresch if he could speak with the BVCC intelligence officer, to which Officer Tresch responded that the intelligence officer was "busy." **(# 1 at 8, # 54 at 12)**. Then, Officer Tresch attempted to physically place Mr. Dawson in a cell with Mr. Moore. Mr. Dawson resisted and was arrested and taken to the BVCC segregation unit. **(# 1 at 8, # 54 at 12)**.

On February 9, 2018, Mr. Dawson was moved from the segregation unit and placed in the BVCC's Lower North Housing Unit. On March 2, 2018, a Hispanic inmate visited Mr. Dawson's cell and asked him about his issues with Mr. Moore. **(# 54 at 12)**. Mr. Dawson invited the inmate to sit down on his bed, and as he was attempting to explain the situation, the inmate struck Mr. Dawson causing his head to hit a steel toilet, rendering Mr. Dawson unconscious. **(# 54 at 12)**. Mr. Dawson sustained a large knot on the left side of his head along with a swollen jaw and cheekbone and as a result, experienced headaches and nausea. **(# 54 at 12)**.

Then, on March 25, 2018, Mr. Dawson was physically attacked by another inmate who entered his cell and stated, "Arthur Moore." **(# 54 at 13)**. Mr. Dawson contends that as he was struck, his head hit the steel sink, knocking him unconscious again. **(# 54 at 13)**. He suffered another injury to his face and head and experienced headaches, nausea, dizziness, and disorientation. Mr. Dawson requested medical attention, and on April 4, 2018, he was treated for his complaints related to a concussion. **(# 54 at 13)**.

Mr. Dawson contends that throughout the remainder of 2018, he received death threats from unknown inmates at BVCC. **(# 54 at 13)**.

## Exhaustion of Administrative Grievances

On February 14, 2018, Mr. Dawson filed a Step 1 grievance, generally alleging that when he arrived at BVCC, he understood that he would be interviewed by an intelligence officer about his prior issues with another BVCC inmate, Arthur Moore. However, Mr. Dawson was told by a corrections officer that he could not speak to the intelligence officer because he was "busy." He further alleges that he is receiving death threats from unknown people "all over BVCC" and requested to be moved out of the facility. On March 13, 2018, Mr. Dawson's Step 1 grievance was denied as unfounded. **(# 49-5)**.

On March 12, 2018, Mr. Dawson filed a Step 2 grievance, reiterating similar allegations that were made in the Step 1 grievance. Mr. Dawson again requested that he be moved out of the BVCC. On March 20, 2018, the Step 2 grievance was denied, stating that Mr. Dawson's claims were investigated but his "custody issues could not be verified." **(# 49-6)**.

On April 4, 2018, Mr. Dawson filed a Step 3 grievance, which set forth the same allegations — that BVCC officials failed to follow security protocol after Mr. Dawson informed them of his issues with inmate Arthur Moore. Also, Mr. Wilson reiterated his request that he be moved out of BVCC. **(# 49-7)**. The Step 3 grievance was denied in a letter by Anthony DeCesaro, a grievance officer. Specifically, the letter provided that Mr. Dawson did not exhaust his administrative remedies because Mr. DeCesaro could not determine "what relief" Mr. Dawson was requesting. The letter further explained that "[w]hen drafting a grievance you must include what remedy you are seeking. I cannot make a determination of the facts if no solution or restitution is plead. There is no way I can determine what it is that would satisfy your grievance." **(# 49-7)**.

**This Action**

Mr. Dawson filed his Complaint **(# 1)** *pro se* and has continued to represent himself in this action.[2] As narrowed by Senior Judge Babcock **(# 8)**, Mr. Dawson's sole claim is brought under 42 U.S.C. § 1983, alleging that the Defendants were deliberately indifferent to the risk that Mr. Dawson would be physically attacked by fellow inmates, in violation of the Eighth Amendment to the U.S. Constitution.[3]

The Defendants seek summary judgment on the claim on two grounds. First, they argue that Mr. Dawson has not exhausted his administrative remedies in accordance with the CDOC's grievance process. Second, they argue that each is entitled to qualified immunity because Mr. Dawson cannot establish a violation of his clearly established constitutional rights. In particular, they state that Mr. Dawson cannot make a showing to establish his prima facie claim. In response, Mr. Dawson contends there are disputed issues of material fact precluding entry of summary judgment. The Court addresses each argument in turn.

## ANALYSIS

**A. Applicable Legal Standards**

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary. *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995).

---

[2] Because of Mr. Dawson's *pro se* status, the Court construes his filings liberally. *Haines v. Kerner,* 404 U.S. 519, 520-21 (1972).

[3] Mr. Dawson also purported to assert a claim sounding in a deprivation of Substantive Due Process under the 14th Amendment. The Defendants argue that such a claim essentially merges with Mr. Dawson's existing and more specific Eighth Amendment claim. *See Berry v. City of Muskogee*, 900 F.2d 1489, 1493-94 (10th Cir. 1990). Mr. Dawson does not specifically respond to this portion of the Defendants' motion. The Court finds merit in the Defendants' argument and deems Mr. Dawson's Fourteenth Amendment claim merged into his Eighth Amendment claim.

Summary adjudication is authorized when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Substantive law governs what facts are material and what issues must be determined. It also specifies the elements that must be proved for a given claim or defense, sets the standard of proof and identifies the party with the burden of proof. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989). A factual dispute is "genuine" and summary judgment is precluded if the evidence presented in support of and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter for either party. *See Anderson*, 477 U.S. at 248. When considering a summary judgment motion, a court views all evidence in the light most favorable to the non-moving party, thereby favoring the right to a trial. *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

If the movant has the burden of proof on a claim or defense, the movant must establish every element of its claim or defense by sufficient, competent evidence. *See* Fed. R. Civ. P. 56(c)(1)(A). Once the moving party has met its burden, to avoid summary judgment the responding party must present sufficient, competent, contradictory evidence to establish a genuine factual dispute. *See Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991); *Perry v. Woodward*, 199 F.3d 1126, 1131 (10th Cir. 1999). If there is a genuine dispute as to a material fact, a trial is required. If there is no genuine dispute as to any material fact, no trial is required. The court then applies the law to the undisputed facts and enters judgment.

If the moving party does not have the burden of proof at trial, it must point to an absence of sufficient evidence to establish the claim or defense that the non-movant is obligated to prove.

If the respondent comes forward with sufficient competent evidence to establish a *prima facie* claim or defense, a trial is required. If the respondent fails to produce sufficient competent evidence to establish its claim or defense, then the movant is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

### B. Exhaustion of Remedies

The Prison Litigation Reform Act ("PLRA") requires prisoners to exhaust administrative remedies for claims brought under federal law, and such exhaustion is mandatory prior to bringing suit. 42 U.S.C. § 1997e(a). The PLRA requires "proper exhaustion" which means the plaintiff must utilize all administrative remedies provided and must comply with the deadlines and other procedural rules prior to filing a lawsuit relating to the conditions of confinement. *Woodford v. Ngo*, 548 U.S. 81, 85, 90–91 (2006)). The PLRA imposes no specific procedure for the grievance process; rather, it is the prison's own grievance procedures that set forth what the prisoner must do to exhaust his or her administrative remedies. *Jones v. Bock*, 549 U.S. 199, 218 (2007).

The Defendants bear the burden of showing that Mr. Dawson failed to exhaust his available remedies. *Roberts v. Barreras*, 484 F.3d 1236, 1241 (10th Cir. 2007). In support of their argument, they have proffered the affidavit of Anthony DeCesaro, a CDOC Step 3 Grievance Officer and a copy of the CDOC's Administrative Regulation 850–04. **(# 49-1, # 49-4)**. Mr. DeCesaro identifies CDOC's Administrative Regulation 850–04 as setting forth a required three-step grievance procedure that applies to CDOC offenders. **(# 49-1, # 49-4)**. Administrative Regulation 850–04(IV)(D)(9)(b) requires that a grievance "clearly state the basis for the grievance and the relief requested in the place provided in the form." Administrative Regulation 850–04(IV)(E)(3)(c)(2) provides that a Step 3 grievance officer "may deny the

7

grievance on procedural grounds . . . if the grievance is incomplete, inconsistent with a former step, incomprehensible, illegible, requests relief that is not available, fails to request relief, or in any other way fails to comply with this regulation." **(# 49-4)**.

The Defendants acknowledge that Mr. Dawson properly filed Step 1, Step 2, and Step 3 grievances, but they contend that his Step 3 grievance omitted a critical piece of information — "an intelligible request for relief." **(# 49 at 15)**. Due to this deficiency, they contend that the grievance did not comply with Administrative Regulation 850–04 and thus Mr. Dawson failed to complete the grievance process. The Court disagrees.

Mr. Dawson's Step 1, Step 2, and Step 3 grievances all contain the following language:

Failure to follow CDOC Security Protocol: when I arrived at BVCC, I was advised that I would be interviewed by BVCC's intel-officer. I asked to speak with him and was told by the CO who gave me a disciple. R. for DOADD for refusing to move into the cell with Arthur Moore or housed in GP that the intel-officer was busy. While housed at [Limon Correctional Facility] with offender Moore, I gave him a knife to settle a racial dispute. He deliberately got caught with the knife, blamed it on me, and was sent to CSP. I'm now receiving threats from unknown people all over BVCC.

<u>My requested remedy is</u> that *Howard v. Waite*, 534 F.3d 1227 and 18 U.S.C. 242 be read so everyone at BVCC will acknowledge their civil and criminal liability for ignoring my safety and <u>move me out of BVCC</u>. I'm getting death threats.

**(# 49-5, # 49-6, and # 49-7)**. This language clearly sets forth the remedy that Mr. Dawson requests — that he be moved out of BVCC. It also explains why he requests that remedy — because he was receiving death threats. The Defendants' characterize this request as "a vague reference to being moved out of BVCC" **(# 49 at 4).** To this Court, the request does not appear vague or unintelligible. There is no ambiguity in Mr. Dawson's request to be "moved out of BVCC." Indeed, the Defendants fail to explain how this request could have been more specifically articulated. The Court therefore finds that Mr. Dawson properly complied with the CDOC's Administrative Regulation 850–04(IV)(D)(9)(b). Accordingly, summary judgment for

failure to exhaust administrative remedies is denied.

**C. Qualified Immunity**

The Defendants contend that they are entitled to qualified immunity because Mr. Dawson cannot come forward with sufficient evidence to show a clearly established constitutional violation. Qualified immunity protects individual state actors from civil liability if their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012). When qualified immunity is raised, the burden shifts to Mr. Dawson to establish two prongs: (i) that he has adequately asserted a violation of a constitutional right, and (ii) the contours of that right were "clearly established" by existing Supreme Court or 10th Circuit precedent (or the weight of authority from other circuits) at the time of the events herein. *T.D. v. Patton*, 868 F.3d 1209, 1220 (10th Cir. 2017).

1. <u>Sufficient constitutional violation</u>

The Court begins with the first prong. For all practical purposes, the inquiry conducted under this prong – adequate assertion of a constitutional violation -- is indistinguishable from the inquiry that the Court would make in determining whether the plaintiff has come forward with sufficient evidence to establish a *prima facie* claim in accordance with Rule 56. The plaintiff must produce sufficient evidence, which if true, would make a *prima facie* showing of a cognizable claim. The Court considers the evidence in the light most favorable to the plaintiff and assesses whether it is sufficient to demonstrate the violation of a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

It is well established that prison officials have a duty to protect inmates from violence at the hands of other prisoners, and that a prison official who is deliberately indifferent to a

substantial risk of serious harm to an inmate violates that inmate's Eighth Amendment rights. *Benefield v. McDowell*, 241 F.3d 1267, 1270-71 (10th Cir. 2001). To establish such a claim, Mr. Dawson must show that: (i) he faced an objectively serious risk of harm, namely, a likelihood that he would be attacked by fellow inmates; and (ii) that each Defendant was both aware of that risk and nevertheless was deliberately indifferent to it.[4] *Wilson v. Falk*, 877 F.3d 1204, 1209-10 (10th Cir. 2017).

    (a). <u>Objective element</u>

The Court begins by considering whether Mr. Dawson has come forward with sufficient evidence that, objectively, he faced a serious risk of being attacked by fellow inmates. This has several components. First, did Mr. Dawson communicate a risk to the Defendants? According to Mr. Dawson, he first reported his concerns to the Defendants upon his arrival at BVCC. The Defendants' response indicates that they have no recollection of the communication. This, ordinarily, would be insufficient to rebut Mr. Dawson's claim, but to the extent one treats it as a denial, it creates a genuine dispute as to whether Mr. Dawson told the Defendants about his safety concerns upon his arrival. To some degree, however, whether the communication occurred is moot, however, because there is no dispute that Mr. Dawson repeated his concerns in grievances he filed in February 2018, before he was assaulted. In them, he specifically identified, by name, the inmate he had a dispute with (Arthur Moore) and the particular circumstances underlying that dispute (the knife incident in Limon). Thus, there is no dispute

---

[4] There is, implicitly, a third element: that the inmate was injured as a result of the prison officials' deliberate indifference. It is on this element that the Defendants appear to hang much of their defense: for various reasons, they dispute that Mr. Dawson was ever assaulted at all at BVCC. Because the Court must accept Mr. Dawson's version of events as true for purposes of this Order, the Court will assume that the assaults did indeed occur. Whether the Defendants' version of events can find traction at trial is a matter upon which this Court need not opine.

10

that the Defendants knew of Mr. Dawson's safety concerns before he was attacked.

A second component is whether the risk was serious at the time it was communicated? The record, viewed in the light most favorable to Mr. Dawson, shows that he <u>was</u> repeatedly attacked by his fellow inmates for the very reasons that he predicted. At a minimum, this is sufficient evidence to create a genuine issue of material fact as to whether Mr. Dawson articulated an objectively-ascertainable risk to his safety.

The Defendants argue that there is no evidence of an objectively-ascertainable risk that Mr. Dawson would be attacked by Mr. Moore or his affiliates because they investigated Mr. Dawson's complaints and were unable to verify Mr. Dawson's concerns. Putting aside the fact that crediting the Defendants' position on this point would require the Court to reject Mr. Dawson's evidence that he <u>had been attacked twice</u> by Mr. Moore's affiliates, the Court notes that the Defendants' evidence of such an investigation is slight.

In his affidavit **(# 49-2)**, Mr. Lisac states that unspecified "individuals who responded to [Mr. Dawson's] grievances" in February 2018 about being housed with Mr. Moore and his affiliates "determined that Mr. Dawson's custody issues could not be verified." Mr. Lisac goes on to state that he conducted his own investigation of Mr. Dawson's concerns in April 2018 – *after the assaults occurred* -- but that investigation appears to have consisted simply of reviewing CDOC's records about individuals with whom Mr. Dawson was known to have custody issues and noting that Mr. Moore was not among those listed. The untimeliness and limited scope of such investigation simply reinforces Mr. Dawson's position in this matter: that CDOC's records were incomplete because they did not reflect his issues with Mr. Moore. Taking the evidence in the light most favorable to Mr. Dawson, he advised BVCC officials that he had (undocumented) custody issues if housed with Mr. Moore, and no BVCC official appears

11

to have actively investigated the matter (by, say, interviewing Mr. Dawson about his concerns, by speaking with Mr. Moore, by reviewing records of the incident involving Mr. Moore and Mr. Dawson in Limon).

Mr. Coleman's affidavit **(# 49-3)** also fails to support the Defendants' contention that Mr. Dawson cannot establish the objective element. Like Mr. Lisac, Mr. Coleman relies on the fact that <u>someone else</u> (again unidentified) investigated Mr. Dawson's concerns in February 2018 and that "his claims about being threatened could not be validated." Mr. Coleman's lack of personal knowledge about the nature and scope of the February 2018 investigation prevent the Court from concluding that such an investigation could dispel the objective reasonableness of Mr. Dawson's concerns.

Thus, the Court finds that Mr. Dawson has come forward with sufficient evidence to create a triable issue of fact as to the objective element of his Eighth Amendment claim against each Defendant.

(b). <u>Subjective element as against Mr. Coleman and Mr. Lisac</u>

According to Mr. Dawson, during his orientation he told Mr. Coleman and Mr. Lisac about his history with inmate Arthur Moore including the incident with the knife at the Limon Correctional Facility. **(# 1 at 7, # 54 at 11-12)**. Mr. Dawson also told them that if he was housed in the same facility as Mr. Moore, his life was in jeopardy. In response, Mr. Dawson states that Mr. Coleman and Mr. Lisac "assured" him that they would "make sure" he was interviewed by a BVCC Intelligence Officer and removed from the BVCC general population if appropriate. **(# 1 at 7, # 54 at 11-12)**. It is undisputed that neither Mr. Lisac nor Mr. Coleman followed through on the promise to have an Intelligence Officer discuss Mr. Dawson's concerns. This is sufficient to demonstrate at least a triable question as to whether Mr. Coleman and Mr.

12

Lisac were deliberately indifferent to Mr. Dawson's concerns.

Both Mr. Lisac and Mr. Coleman assert that, had Mr. Dawson informed them of his concerns – they profess to have no recollection as to whether Mr. Dawson did so or not – they would have "direct[ed him] to speak with an Intelligence Officer." In other words, Mr. Lisac and Mr. Coleman contend that the onus was on <u>Mr. Dawson</u> to find an Intelligence Officer and relate his concerns. The Court has some doubt that foisting the responsibility to Mr. Dawson to locate and communicate with an Intelligence officer discharges the obligations of prison officials under the Eighth Amendment obligations. As an example, in *Howard v. Waide*, 534 F.3d 1227, 1241 (10th Cir. 2008), the plaintiff inmate informed prison officials about his concerns that he was assigned to a housing unit with other inmates that had previously threatened him with harm; in response, some defendants simply announced that "housing classifications are 'not grievable.'" Assuming that this was a correct statement, the 10th Circuit nevertheless explained that "[b]ecause prison officials are required to take reasonable protective action once a risk comes to their attention, such an explanation does not satisfy the defendants' Eighth Amendment duties because the limitations of prison grievance procedures cannot override constitutional duties." *Id.* The same logic applies here.

It may very well be that it was the duty of an Intelligence Officer, not Mr. Lisac or Mr. Coleman, to investigate and resolve Mr. Dawson's concerns. But as in *Howard*, Mr. Lisac and Mr. Coleman's constitutional duties were not discharged simply by telling Mr. Dawson that he was complaining to the wrong person. Rather, the Eighth Amendment required Mr. Lisac and Mr. Coleman to take some affirmative action of their own in response – perhaps specifically arranging an interview with Mr. Dawson and an Intelligence Officer, or by conveying his concerns to an Intelligence Officer themselves and seeking further instruction, or by conducting

their own investigation into the issue. Because the record reflects that they did nothing more than instruct Mr. Dawson to raise his concerns to someone else, there is a triable issue of fact as to whether Mr. Lisac and Mr. Coleman were subjectively indifferent to Mr. Dawson's concerns. *See e.g. Wilson v. Falk*, 877 F.3d 1204, 1211 (10th Cir. 2017) (reversing grant of summary judgment, finding that inmate's statement that "they home-boys . . .was going to get him" was sufficiently specific to support Eighth Amendment claim against prison officials who failed to protect inmate from attack).

Thus, Mr. Coleman and Mr. Lisac are not entitled to the protection of qualified immunity or to summary judgment in their favor. The claim against them must proceed to trial.

(c). Subjective element as against Mr. Tresch

Mr. Dawson also brings this claim against Mr. Tresch, on slightly different facts. He states that after he was initially escorted to the East Housing Unit, he told Corrections Officer Tresch about his history with Arthur Moore while Arthur Moore was standing outside the unit office. **(# 1 at 8, # 54 at 12)**. Mr. Dawson asserts that Officer Tresch denied his request to talk to an Intelligence Officer, stating that the officer was "busy." **(# 1 at 8, # 54 at 12)**. In addition, Officer Tresch attempted to physically place Mr. Dawson in a cell with Mr. Moore. **(# 1 at 8, # 54 at 12)**. When Mr. Dawson refused to enter the cell with Mr. Moore, Officer Tresch issued him a disciplinary report for refusing a direct order, and Mr. Dawson was taken to BVCC's segregation unit where he was housed for the next 11 days. **(# 1 at 8, # 54 at 12)**. Then, on February 9, 2018, Mr. Dawson was "physically forced out of the … segregation unit and placed in the facility's Lower North Unit." **(# 1 at 8, # 54 at 12)**. The first attack occurred on March 2, 2018 and the second occurred on March 25, 2018, causing Mr. Dawson to suffer injuries to his head and jaw. **(# 1 at 8-9, # 54 at 12-13)**.

14

Mr. Tresch seeks summary judgment on the subjective prong of Mr. Dawson's Eighth Amendment failure to protect claim. Applying the same analysis to Mr. Tresch as the Court applied to both Mr. Coleman and Mr. Lisac, the Court finds Mr. Dawson has shown that he faced an objectively serious risk of harm of being attacked by Arthur Moore and that he communicated that risk to Mr. Tresch. Once again, Mr. Tresch was obligated to do more in response than just refer Mr. Dawson to speak to an Intelligence Officer at some later point in time. Indeed, the record suggests that Mr. Tresch effectively prevented Mr. Dawson from presenting his concerns to an Intelligence Officer because Mr. Tresch immediately attempted to force Mr. Dawson into a cell with Arthur Moore despite Mr. Dawson's complaints.

Such evidence, if true, demonstrates subjective deliberate indifference on the part of Mr. Tresch. He knew about the risk of harm to Mr. Dawson, and he did nothing to abate that risk. Indeed, the allegations suggest that his actions might have exacerbated the situation by attempting to place both Mr. Dawson and Mr. Moore in a cell together. In sum, viewing his conduct in the totality, the Court concludes that, as to Mr. Tresch, the objective and subjective components are satisfied. Thus, Mr. Tresch is not entitled to the protection of qualified immunity on Mr. Dawson's clearly established Eighth Amendment claim for failure to protect, and his motion for summary judgment is denied.

### 2. Clearly Established

The second prong of the qualified immunity analysis focuses upon whether the right was "clearly established" at the time it was violated. The "clearly established" analysis examines whether there was existing precedent, at the time of the challenged events, that recognized a constitutional violation in similar circumstances. Courts are required to conduct the "clearly established" analysis at a "high degree of specificity," rather than in generalities. *District of*

*Columbia v. Wesby*, 138 S.Ct. 577, 590 (2018). However, the specificity requirement is not so exacting that "the very action in question [must have] previously been held unlawful." *Ziglar v. Abassi*, 137 S.Ct. 1843, 1866, 198 L.Ed.2d 290 (2017).

The Court finds that cases such as *Howard* clearly establish that the Defendants' conduct in this case could constitute an Eighth Amendment violation. There, an inmate complained to prison officials that he was at risk of assault from specific inmates in his housing unit. The prison officials in *Howard* deflected those concerns with various justifications, rather than investigating them and acting upon them. The 10th Circuit found that such conduct could constitute a violation of the inmate's Eighth Amendment rights, and further, that the contours of that right were "clearly established." In light of *Howard*, this Court concludes that the unconstitutionality of the conduct Mr. Dawson alleges here was "clearly established" by 2018, such that the Defendants are not entitled to qualified immunity.

**D. Motion to Restrict Access**

The Defendants move to restrict public access to several exhibits filed in support of the summary judgment briefing pursuant to D.C. Colo. L. Civ. R. 7.2. "Courts have long recognized a common-law right of access to judicial records." *United States v. Bacon*, 950 F.3d 1286, 1292 (10th Cir. 2020) (citing *Colony Ins. Co. v. Burke*, 698 F.3d 1222, 1241 (10th Cir. 2012)). "Although this common law right is not absolute, there is a strong presumption in favor of public access." *Id.* (internal quotation marks and citations omitted). However, this strong presumption of openness can "be overcome where countervailing interests heavily outweigh the public interests in access" to the judicial record. *Id.* Thus, in exercising their discretion to restrict access to judicial records, courts must "weigh the interests of the public, which are presumptively paramount, against those advanced by the parties." *Id.*

Additionally, Local Rule 7.2 requires a party seeking to restrict access to make several specific showings, including: (i) demonstrating why the private interest outweighs the public one, (ii) identifying a "clearly defined and serious injury that would result if access is not restricted," and (iii) showing why alternatives to restriction, such as redaction or summarization, would not be effective in avoiding the need for outright restriction. D.C. Colo. L. Civ. R. 7.2(c)(2)-(4). With these principles in mind, the Court turns to Defendants' motion.

The Defendants move **(# 53)** to restrict public access to two exhibits attached to their motion for summary judgment. The exhibits consists of documents that detail various custody issues involving Mr. Dawson and other CDOC inmates. Specifically, the documents **(# 51 and # 52)** include the full names of inmates, where they are housed, and the nature of the custody issues related to Mr. Dawson. The descriptions of the particular custody issues are fact specific and include inmates who have: (i) testified against Mr. Dawson in criminal proceedings; (ii) had prior physical incidents with Mr. Dawson while in custody; (iii) been involved in criminal activity with or against Mr. Dawson prior to incarceration; and (iv) made threats toward Mr. Dawson or have been threatened by Mr. Dawson. The motion states that this type of detailed, sensitive, and personal information pertains to both prison safety and security matters, the disclosure of which could pose a serious risk of physical harm to various individuals within the CDOC. The Court agrees. This material implicates a substantial privacy interest to the named inmates that outweighs the public interest. Finally, the motion acknowledges that there are no less-restrictive alternatives available such as editing or redacting the documents. Again, the Court agrees – the sensitive material in the exhibits is also the material that makes the exhibits relevant, making redaction or other alternatives to restriction impossible. Accordingly, the Court

grants the motion, in part, insofar as it seeks to restrict to level 2 access the exhibits filed at Docket # 51 and Docket # 52.

The Defendants also move to restrict access to Mr. Dawson's medical records filed in support of their motion for summary judgment at Docket # 50. This exhibit contains general medical records from Mr. Dawson's time in the CDOC relevant to this case, including records that directly relate to injuries he contends he suffered as a result of the inmate assaults at issue here. Thus, the Court finds that these records are not appropriate for restriction. Mr. Dawson put his medical condition at issue as part of his claims and even testified to his various medical conditions during his deposition. Further, the records contain information that is central to the issues implicated in this case. His privacy interests in concealing information about his own health condition does not overcome the strong public interest in understanding the pertinent facts of this case. Accordingly, the Court denies the Defendants' request to restrict access to Docket # 50.

The Defendants' motion is granted in part and denied in part in that the Clerk of the Court shall lift all access restrictions on Docket # 50 while the Court deems it appropriate to maintain level 2 restricted access to Docket # 51 and # 52.

### CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment **(# 49)** is **DENIED** on the terms set forth above. Claim One alleging an Eighth Amendment deprivation against Mr. Coleman, Mr. Lisac, and Mr. Tresch will proceed to trial. The parties shall promptly begin preparation of a Proposed Pretrial Order and shall jointly contact chambers to schedule a Pretrial Conference.

The Defendants' motion to restrict access **(# 53)** is **GRANTED IN PART AND DENIED IN PART** as set forth herein. The Clerk of the Court shall lift all access restrictions on Docket # 50; the provisional restrictions in place on all other filings shall remain in place.

Mr. Dawson's Motion for Leave to File a Surreply **(# 57)** is **DENIED AS MOOT**.

Dated this 30th day of March, 2020.

**BY THE COURT:**

Marcia S. Krieger
Senior United States District Judge